IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

COLLEEN MCCLEAN,                    )
                                    )
              Plaintiff,            )
                                    )
      v.                            )      1:17CV603
                                    )
DUKE UNIVERSITY, SHEILA             )
BRODERICK, and STEVEN THOMAS        )
BISHOP,                             )
                                    )
              Defendants.           )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

       This case is currently before the court on three motions to

dismiss, one filed separately by each Defendant: Duke University

("Duke"), (Doc. 29), Sheila Broderick ("Broderick"), (Doc. 26),

and Steven Thomas Bishop ("Bishop"), (Doc. 31). Each Defendant

moves to dismiss the relevant claims contained in Plaintiff

Colleen McClean's First Amended Complaint for failure to state a

claim pursuant to Fed. R. Civ. P. 12(b)(6). Based on the

following analysis, this court determines that Duke's motion to

dismiss should be granted in full. This court further finds that

the motions to dismiss filed by Defendants Broderick and Bishop

should each be granted in part and denied in part, as set forth

herein.

## I.  BACKGROUND AND PROCEDURAL HISTORY

### A.  Factual Background

In reviewing a motion to dismiss, this court "must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007).

Plaintiff was a dual-degree student enrolled in Duke's School of Medicine and Graduate School. (First Amended Complaint ("Am. Compl.") (Doc. 20) ¶ 13.) According to the Complaint, at some point in time, Plaintiff was raped and sexually assaulted by Bishop.[1] (Id. ¶ 12.) Plaintiff reported the rape and then confronted Bishop, who became angry and threatened Plaintiff. (Id. ¶ 15.) Bishop was, at the time, in a relationship with Broderick, Duke's Coordinator of Gender Violence Intervention Services. (Id. ¶ 16–17.) Bishop allegedly continued to harass Plaintiff and threatened that Broderick, as his girlfriend, would use her position to undermine Plaintiff's credibility and destroy Plaintiff's reputation if Plaintiff continued to pursue complaints about the alleged assault.[2] (Id. ¶¶ 16–19.) When

---

[1] The Complaint does not allege the location of the rape. Plaintiff also does not allege that Bishop was, at that time or at any time thereafter, employed by or affiliated with Duke University in any capacity.

[2] Specifically, Bishop allegedly stated that Broderick had already accessed Plaintiff's confidential Duke records. (Id. ¶ 16.)

Plaintiff attempted to report the assault through Duke, she was referred to Broderick and wrote Broderick to request counselling and other support services, (id. ¶¶ 21-22), which Broderick failed to provide.

Plaintiff alleges further that, over an unspecified time period, Bishop and Broderick engaged in a campaign to impugn Plaintiff's reputation by (1) making false stalking reports to the Duke Police Department, (id. ¶¶ 30-31), (2) disclosing Plaintiff's confidential sexual assault report widely within the university, (id. ¶ 32), (3) causing a Duke University Police officer to make false statements regarding Plaintiff at a custody hearing involving Bishop, (id. ¶¶ 35-37), and (4) compiling and disseminating negative information about Plaintiff to destroy her reputation both at Duke and within the medical community at large, (id. ¶¶ 43, 48-49.)

Plaintiff alleges that other Duke officials and administrators were involved, to varying degrees, in the scheme perpetrated by Bishop and Broderick. First, Broderick's immediate supervisor refused to provide any counselling or other services when Plaintiff followed up on her letter to Broderick and instead directed Plaintiff to seek help outside the university. (Id. ¶ 24.) Second, Broderick's colleague in the Student Affairs Division allegedly "interrogated" Plaintiff

about her complaint and relationship with Bishop. (Id. ¶ 29.)
Third, another Student Affairs administrative allegedly told
Plaintiff that Duke would not treat Plaintiff's letter to
Broderick as confidential and that Duke was not investigating
the alleged rape. (Id. ¶¶ 32–33.) Finally, when one of
Broderick's colleagues reported Broderick's behavior to
"supervisors" and "managing employees" of the university, these
supervisors "took no meaningful action." (Id. ¶¶ 47–50.)

B.    **Procedural History**

Plaintiff filed her initial complaint in the Durham County
Superior Court, (Doc. 4), and the case was then removed by Duke
to this court. (Doc. 1.) Plaintiff filed an amended complaint
(Am. Compl. (Doc. 20).) Each Defendant moved to dismiss the
First Amended Complaint[3] and filed a brief in support of that
motion: Duke, (Docs. 29, 30), Broderick, (Docs. 26, 27), and
Bishop, (Docs. 31, 32.) Plaintiff responded opposing each
motion: Duke, (Doc. 37), Broderick, (Doc. 39), and Bishop, (Doc.
38). Each Defendant then replied: Duke, (Doc. 42), Broderick,
(Doc. 43), and Bishop, (Doc. 44).

---

[3] As the First Amended Complaint is now the operative
pleading, this court will refer to this document as "the
Complaint" throughout this order.

### C.  **Jurisdiction and Governing Law**

This court has jurisdiction over Plaintiff's Title IX claim because it arises under federal law. See 28 U.S.C. § 1331. When a federal court has federal question jurisdiction over some claims, it may exercise supplemental jurisdiction over all related claims that "form part of the same case or controversy." See 28 U.S.C. § 1367; see also Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 616 (4th Cir. 2001) (observing that the district court had discretion to exercise supplemental jurisdiction and could retain or remand to state court any state law claims after all federal claims were dismissed). Plaintiff's state claims all relate to the same factual nexus as Plaintiff's federal claims: Plaintiff's alleged rape, attempts to report and seek treatment following the rape, and the alleged harassment of Plaintiff by Bishop and Broderick. Therefore, these claims are all part of the same case or controversy, and this court may properly exercise supplemental jurisdiction over the state law claims.

A federal court sitting in diversity or supplemental jurisdiction applies state substantive law and federal procedural law. Hanna v. Plumer, 380 U.S. 460, 465–66 (1965); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 72–73, 79–80 (1938); see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726

(1966) (holding that federal courts are "bound to apply state law" to pendant claims); In re Exxon Valdez, 484 F.3d 1098, 1100 (9th Cir. 2007) (finding that Erie's central holding applies to supplemental jurisdiction cases).

This court, sitting in supplemental jurisdiction, "has a duty to apply the operative state law as would the highest court of the state in which the suit was brought." Liberty Mut. Ins. Co. v. Triangle Indus., Inc., 957 F.2d 1153, 1156 (4th Cir. 1992). If the state's highest court has not addressed an issue, then a "state's intermediate appellate court decisions constitute the next best indicia of what state law is although such decisions may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." Id. (internal quotation marks and citation omitted).

### D.    **Standard of Review**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To be facially plausible, a claim must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable" and must

demonstrate "more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556–57). When ruling on a motion to dismiss, a court must accept the complaint's factual allegations as true. Id. Further, "the complaint, including all reasonable inferences therefrom, [is] liberally construed in the plaintiff's favor." Estate of Williams-Moore v. All. One Receivables Mgmt., Inc., 335 F. Supp. 2d 636, 646 (M.D.N.C. 2004) (citation omitted).

Nevertheless, the factual allegations must be sufficient to "raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 500 U.S. at 555, 570; see also Iqbal, 556 U.S. at 680; Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (applying the Twombly/Iqbal standard to evaluate the legal sufficiency of pleadings). A court cannot "ignore a clear failure in the pleadings to allege any facts which set forth a claim." Estate of Williams-Moore, 335 F. Supp. 2d at 646. Consequently, even given the deferential standard allocated to pleadings at the motion to dismiss stage, a court will not accept mere legal conclusions as true and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice." Iqbal, 556 U.S. at 678.

**E.  Statute of Limitations**

The statute of limitations for a Title IX claim is determined by reference to the state statute most closely analogous to Title IX, which is usually a personal injury cause of action. See, e.g., Curto v Edmundson, 392 F.3d 502, 503–04 (2d Cir. 2003). In North Carolina, the statute of limitations for a personal injury claim is three years. N.C. Gen. Stat. § 1-52(16); see also Misenheimer v. Burris, 260 N.C. 620, 622, 637 S.E.2d 173, 175 (2006). This period begins to run when injury "becomes apparent or ought reasonably to have become apparent to the claimant, whichever event occurs first." N.C. Gen. Stat. § 1-52(16).

A four-year statute of limitations applies to Plaintiff's North Carolina unfair and deceptive trade practices claim. See Lucky Ducks, Ltd. v. Leeds, No. COA07-1469, 2008 WL 2968123, at *2 (N.C. Ct. App. 2008). Plaintiff's other state law claims are all subject to a three-year statute of limitations. See N.C. Gen. Stat. § 1-52; Benedith v. Wake Forest Baptist Med. Ctr., No. COA17-284, 2017 WL 3027619, at *1 (N.C. Ct. App. 2017); Birtha v. Stonemor, N.C., LLC, 220 N.C. App. 286, 292, 727 S.E.2d 1, 7 (2012); Waddle v. Sparks, 331 N.C. 73, 85–86, 414 S.E.2d 22, 28–29 (1992).

The Complaint includes only three dates: Plaintiff states that Broderick moved her private practice into Bishop's home in March 2014, that Broderick began living with Bishop in September 2015, and that Plaintiff filed a formal civil rights complaint in October 2015. (Am. Compl. (Doc. 20) ¶¶ 42, 45.) Plaintiff filed her initial complaint in this matter on June 29, 2017. (Doc. 4.) With only these dates established, it is impossible at this time to determine whether any of Plaintiff's various claims are barred by their respective statutes of limitation.

Duke raises statute of limitations as an affirmative defense. (Def. Duke's Mem. in Supp. of Mot. to Dismiss ("Def. Duke's Mem.") (Doc. 30) at 8-9.) Claims ordinarily are not dismissed due to statute of limitations at the 12(b)(6) stage, unless "the . . . complaint sets forth on its face the facts necessary to conclude that plaintiff's claims are barred by the statute of limitations." Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007); see also Richmond, Fredericksburg & Potomac R.R. Co. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993) (stating that a statute of limitations "defense may be raised under Rule 12(b)(6), but only if it clearly appears on the face of the complaint") (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357, at 348-49 (2d ed. 1990)). At a later point in this case, it may become clear through

discovery that certain or all of the alleged conduct falls outside of the relevant statute of limitations, barring any of the remaining claims. However, it is not clear from the face of the Complaint that any specific allegations are time-barred, and this court will not presently dismiss any claims for this reason.

## II.  TITLE IX SEX DISCRIMINATION

### A.  Legal Framework

Title IX states that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. While not explicitly mentioned in the statute itself, Title IX contains an implied private right of action that permits aggrieved parties to sue educational institutions for alleged violations. Cannon v. Univ. of Chi., 441 U.S. 677, 713 (1979).

The typical Title IX violation is some direct conduct by school administrators against a student that discriminates on the basis of that student's sex. See, e.g., Cannon, 441 U.S. at 680 (stating that the school denied admission to a female applicant because she was female); Mercer v. Duke Univ., 190 F.3d 643, 644–45 (4th Cir. 1999) (stating that the school

refused to allow the female plaintiff to participate meaningfully in an intercollegiate football team). Title IX liability also extends to the institution when teachers or other students harass a victim student due to the victim's sex. See Davis v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 646–47 (1999) (finding that a school can be liable for "known acts of student-on-student sexual harassment [when] the harasser is under the school's disciplinary authority"); Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 278 (1998) (stating that a teacher had a sexual relationship with a teenage student).

A Title IX plaintiff must plausibly allege that:

> (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex [under one of the fives theories listed below], (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.

Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007); see also Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 66 (1st Cir. 2002).

Generally speaking, Title IX encompasses five separate theories of liability: namely, that the institution (1) perpetuated and condoned a sexually-hostile environment, (2) was deliberately indifferent to discrimination by individuals under its control, (3) reached an erroneous outcome in disciplinary

proceedings due to sex discrimination, (4) selectively enforced its internal rules on the basis of sex, or (5) used "archaic assumptions" to make athletic funding decisions. See Pederson v. La. State Univ., 213 F.3d 858, 881 (5th Cir. 2000) (finding Title IX discrimination where the university "perpetuated antiquated stereotypes and fashioned a grossly discriminatory athletics system"); Doe v. Claiborne Cty., 103 F.3d 495, 515 (6th Cir. 1996) (stating that Title IX borrows the hostile environment concept from Title VII); Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994) (explaining the difference between erroneous outcome and selective enforcement claims). In each case, the harassment or discrimination must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Davis, 526 U.S. at 650.

To impute liability to the institution, a school official with authority to remedy the discrimination must have actual notice or knowledge of the alleged discriminatory conduct and exhibit "deliberate indifference to discrimination." Jennings, 482 F.3d at 700; Gebser, 524 U.S. at 290-91. Crucially, an institution subject to Title IX is liable "only for its own misconduct"; i.e., only when the institution "exercises significant control over the harasser." Davis, 526 U.S. at 640-

- 12 -

41, 646; see also Simpson v. Univ. of Colo. Boulder, 500 F.3d 1170, 1178–79, 1184–85 (10th Cir. 2007) (finding that deliberate indifference to sexual assaults allegedly committed by football team members could constitute a Title IX violation).

B.    **Analysis**

1.    **Deliberate Indifference to Bishop's Conduct**

Plaintiff attempts to state a deliberate indifference Title IX claim against Duke. (Am. Compl. (Doc. 20) ¶ 56.) However, Plaintiff cannot make out such a claim based on her alleged rape, assault, or harassment by Bishop. While Bishop allegedly sexually harassed Plaintiff, thereby engaging in sex discrimination,[4] it appears that Bishop has never been affiliated with Duke in any way. The Supreme Court has clearly stated that "[d]eliberate indifference makes sense as a theory of direct liability under Title IX only where the funding recipient has some control over the alleged harassment." Davis, 526 U.S. at 644. This is because Title IX covers only discrimination that

---

[4] The Supreme Court has held that sexual harassment, including coerced sexual intercourse, is sex-based discrimination. See Franklin v. Gwinnett Cty. Pub. Schs., 503 U.S. 60, 63, 74–75 (1992) (finding that a teacher's repeated rape of a student on school property supported a Title IX claim, noting that sexual harassment is based on the victim's sex and thus constitutes sex-based discrimination); see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986).

occurs "under any education program or activity," 20 U.S.C.
§ 1681, and not discrimination perpetrated by an unaffiliated
third party. Bishop was, apparently, neither a Duke student nor
a Duke employee, and the Complaint contains no allegations
suggesting that Bishop had any relationship to Duke. Plaintiff
also does not plead facts suggesting that the alleged rape
occurred in a Duke-owned building or a location over which Duke
had any control. Plaintiff fails to establish that Duke
possessed "control over the harasser and the environment in
which the harassment occur[ed]." Davis, 526 U.S. at 644.

The facts here are even further removed from the
educational setting than in those cases finding insufficient
university control over student-on-student harassment at
private, off-campus locations, because Bishop was not a fellow
student. See, e.g., Roe v. St. Louis Univ., 746 F.3d 874, 884
(8th Cir. 2014) (finding that a sexual assault at a privately-
owned fraternity did not occur under a university program or
activity); Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch.
Dist., 511 F.3d 1114, 1121 n.1 (10th Cir. 2008) (holding that
in-school teasing and bullying regarding sexual assaults that
occurred at off-campus locations was not "a sufficient nexus" to
"create liability under Title IX"); Ostrander v. Duggan, 341
F.3d 745, 750 (8th Cir. 2003) (similar holding). Here, Bishop's

- 14 -

behavior clearly falls outside the limited scope of relationships that the Supreme Court has recognized as imputing Title IX liability to an educational institution.[5] Therefore, Plaintiff does not state a Title IX claim against Duke based on Bishop's alleged conduct.

### 2. Deliberate Indifference to Broderick's Conduct

Plaintiff's Title IX claim as to Broderick's conduct is more clear-cut. There is no question that Duke had control over the alleged harasser sufficient to support a Title IX claim, because Duke employed Broderick. See Gebser, 524 U.S. at 290–91. However, the allegations in the Complaint do not plausibly establish that Broderick discriminated against Plaintiff because of Plaintiff's sex.

The gravamen of Title IX is that any discrimination must be "on the basis of sex." 20 U.S.C. § 1681. Here, the evidence that Broderick refused Plaintiff's request for counseling and treatment and allegedly harassed and intimidated Plaintiff because Plaintiff was female is decidedly lacking. Broderick worked as the "University's Coordinator of Gender Violence

---

[5] Further, Bishop's relationship with Broderick, a Duke employee, does not transform this into a proper Title IX claim. The test is not whether the harasser is tangentially associated with the institution, but rather whether the institution exercises significant control over the harasser." Davis, 526 U.S. at 646.

Intervention Services" at the Duke University Women's Center,
(Am. Compl. (Doc. 20) ¶¶ 16-17), and Plaintiff has provided no
allegations to suggest that Broderick treated Plaintiff less
favorably than male Duke students who reported assaults. While
the Complaint may establish that Broderick treated Plaintiff
outrageously, there is nothing to suggest that Plaintiff was
treated differently from any male student. It is not sufficient
to allege that Plaintiff may have been treated differently from
other female victims of sexual assault; this may plausibly state
an intentional infliction of emotional distress ("IIED") claim,
but it does not constitute gender-based discrimination.

Further, the allegations point in an entirely different
direction. It appears that Broderick's conduct was motivated not
by Plaintiff's sex, but by Plaintiff's allegedly coerced sexual
involvement with Broderick's boyfriend and by a desire to

retaliate against Plaintiff for reporting the rape and assault.[6]
See, e.g., Sanches v. Carrollton-Farmers Branch Indep. Sch.
Dist., 647 F.3d 156, 165–66 (5th Cir. 2011) (finding that the
alleged harassment was not based on sex and thus not actionable,
because "[t]here is nothing in the record to suggest that [the
harasser] was motivated by anything other than personal
animus"); Seamons v. Snow, 84 F.3d 1226, 1233 (10th Cir. 1996)
("The fact that the coach, and perhaps others, described these
qualities as they pertain to his situation in terms of the
masculine gender does not convert this into sexual
harassment."). While sexual harassment or rape constitutes
discrimination based on the victim's sex, see Franklin, 503 U.S.
at 74–75, this court finds the allegations to establish that
Broderick was more likely motivated by revenge rather than
discriminatory intent and would have likely acted in the same

---

[6] Title IX includes an implied right of action protecting
those who are retaliated against for reporting sexual
discrimination. Jackson v. Birmingham Bd. of Educ., 544 U.S.
167, 183–84 (2005). However, Plaintiff appears to base her Title
IX claim solely on deliberate indifference. (Am. Compl. (Doc.
20) ¶ 56.) To state a Title IX retaliation claim, Plaintiff
would need to show that Duke is liable for Broderick's actions
under respondeat superior (including knowledge of all material
facts) and provide dates plausibly suggesting a causal link
between Plaintiff's sexual assault report and Broderick's
initial retaliatory acts. See, e.g., Clark Cty. Sch. Dist. v.
Breeden, 532 U.S. 268, 273–74 (2001). In the absence of any
allegation that Duke retaliated against Plaintiff in violation
of Title IX, this court cannot properly evaluate the claim.

manner had a male Duke student been assaulted by Bishop and reported that assault.

Because this court finds that any harassment by Broderick was likely driven by personal animus unrelated to Plaintiff's sex, this harassment is not cognizable under Title IX. At the motion to dismiss stage, Plaintiff must plausibly allege "a causal connection between the [university's actions] and gender bias." Yusuf, 35 F.3d at 715. To determine whether a plaintiff has met this standard, this court may consider "an 'obvious alternative explanation' that overwhelms any potential inference of gender bias." Doe v. Univ. of Colo., 255 F. Supp. 3d 1064, 1079 (D. Colo. 2017) (quoting Iqbal, 556 U.S. at 682); see also Doe v. Columbia Univ., 831 F.3d 46, 57 (2d Cir. 2016) (finding, at the 12(b)(6) stage, that alleged pro-victim bias did "not necessarily relate to bias on account of sex"; nevertheless holding that other allegations established the plausibility of sex-based discrimination). Here, this court finds, based on the allegations, that personal animus unrelated to Plaintiff's sex predominately motivated Broderick's conduct and that this fact defeats any plausible inference of sexual bias.

Assuming for argument that Plaintiff has alleged sex-based harassment by Broderick, Duke's response must still rise to the level of deliberate indifference. The Supreme Court has endorsed

the same deliberate indifference standard used for § 1983 civil rights claims in the Title IX context. See Gebser, 524 U.S. at 290. Where a need or deficiency is obvious to officials "and the inadequacy so likely to result in the violation of constitutional rights, . . . [those officials] can reasonably be said to have been deliberately indifferent to the need." City of Canton v. Harris, 489 U.S. 378, 390 (1989) (footnote omitted). Stated differently, deliberate indifference occurs "where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648.

To act with deliberate indifference, an authoritative official must have actual notice of the harassment. Gebser, 524 U.S. at 277. Here, Plaintiff alleges that a colleague of Broderick "reported Ms. Broderick's past and planned retaliation against Plaintiff to . . . managing employees of the University." (Am. Compl. (Doc. 20) ¶ 49.) This court finds Plaintiff has plausibly alleged that Duke officials "with supervisory power over the offending employee" had notice of Broderick's alleged retaliatory conduct. Gebser, 524 U.S. at 280.

Plaintiff further alleges that Duke officials did nothing in response to notice of Broderick's alleged harassment, and

further states that Broderick's colleague informed Plaintiff that her letter reporting a sexual assault would not be kept confidential and that Duke was not investigating Plaintiff's concerns about Bishop. (Am. Compl. (Doc. 20) ¶¶ 32-33.) The Supreme Court has held that, when an institution "ma[kes] no effort whatsoever either to investigate or to put an end to . . . harassment," such inaction amounts to deliberate indifference under Title IX. Davis, 526 U.S. at 654. Plaintiff has alleged facts sufficient to plausibly show that Duke acted with deliberate indifference to Broderick's behavior.[7]

However, because Plaintiff has not plausibly alleged that she was harassed or discriminated against by Broderick on the basis of sex, Plaintiff does not state a Title IX claim against Duke based on Broderick's alleged conduct. Therefore, Duke's motion to dismiss Plaintiff's Title IX claim will be granted.

## III. PENDANT STATE LAW CLAIMS

As this court has determined that Plaintiff's federal Title IX claim against Duke should be dismissed, it must now consider

---

[7] As explained above, because there is no nexus between Plaintiff's alleged rapist and Duke, Duke's response to the alleged rape itself will not be analyzed under the deliberate indifference standard. Title IX imposes no obligation on private educational institutions to respond in any way to acts of harassment when the institution neither causes the harassment nor makes its students vulnerable to the harassment. See Davis, 526 U.S. at 645. Plaintiff has suggested neither as to her alleged rape by Bishop.

whether to evaluate the remaining pendant state law claims, over
which this court has supplemental jurisdiction, or remand these
claims to North Carolina state court. <u>See</u> <u>Carnegie-Mellon Univ.</u>
<u>v. Cohill</u>, 484 U.S. 343, 357 (1988) (stating that courts have
discretion to remand leftover supplemental jurisdiction claims).
In making this determination, this court should consider
"convenience and fairness to the parties, the existence of any
underlying issues of federal policy, comity, and considerations
of judicial economy." <u>Shanaghan v. Cahill</u>, 58 F.3d 106, 110 (4th
Cir. 1995).

This court finds it expedient to the swift resolution of
this dispute to consider all claims in a single ruling rather
than remanding certain claims for further proceedings in a
separate court, especially because this court is now familiar
with the factual nexus underlying Plaintiff's claims. Therefore,
this court will proceed to evaluate Plaintiff's state law
claims.

## IV. <u>INTERFERENCE WITH CIVIL RIGHTS</u>

N.C. Gen. Stat. § 99D-1 prohibits a conspiracy among:

[t]wo or more persons, motivated by race, religion,
ethnicity or gender . . . to interfere with the
exercise or enjoyment by any other person or persons
of a right secured by the Constitutions of the United
States or North Carolina, or of a right secured by a
law of the United States or North Carolina that
enforces, interprets, or impacts on a constitutional
right.

N.C. Gen. Stat. § 99D-1(a)(1).

To fall within the universe of proscribed acts, the conspiracy must intend to interfere with either (1) a right explicitly contained in the U.S. or North Carolina constitution, or (2) a right under state or federal law "that enforces, interprets, or impacts on a constitutional right." N.C. Gen. Stat. § 99D-1(a)(1).

Plaintiff alleges, without elaboration, that Defendants conspired to interfere with her enjoyment of rights "including but not limited to Title IX." (Am. Compl. (Doc. 20) ¶ 68.) Plaintiff further states in her response to Duke's motion to dismiss that Title IX enforces, interprets or impacts on "the constitutional right of equal protection based on gender that is secured by the Equal Protection Clause of the Fourteenth Amendments [sic] and the parallel provision of the North Carolina Constitution." (Pl.'s Opp'n to Duke's Mot. to Dismiss ("Pl.'s Duke Resp.") (Doc. 37) at 11.)[8] Although Plaintiff has suggested that other constitutional rights may be implicated here, Plaintiff ultimately identifies only Title IX and the

---

[8] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

Equal Protection Clause, and this court will consider only these rights as potential bases for Plaintiff's § 99D-1 claim.

This court is aware of only one decision that deals squarely with a similar issue in the context of N.C. Gen. Stat. § 99D-1. See Alexander v. Diversified Ace Servs. II, AJV, No. 1:11CV725, 2014 WL 502496, at *11–13 (M.D.N.C. Feb. 7, 2014). In Alexander, a former judge in this district observed the apparent lack of case law considering whether a plaintiff must identify a specific constitutional right and the level of connection to a constitutional right that brings a conspiracy within the realm of § 99D-1. Id. at *13 (noting the lack of "any authority in which a North Carolina court has directly addressed Defendants' argument that Plaintiff's claim fails because she did not identify a specific constitutional right protected under the United States or North Carolina Constitutions"). Ultimately, the court held that the plaintiff in that case had not shown the source of a constitutional "right to work and earn a living in an environment free of sexually abusive and discriminatory conduct" and had failed to identify any laws interpreting or enforcing this alleged right. Id. at *12.

Without explicit guidance from North Carolina courts on how § 99D-1 is to be interpreted, this court will apply North Carolina law and focus on the plain language of the statute. See

*Erie*, 304 U.S. at 78; see also Burgess v. Your House of Raleigh, Inc., 326 N.C. 205, 209, 388 S.E.2d 134, 136 (1990). Specifically, this court must "ascertain and declare the intention of the legislature, and carry such intention into effect to the fullest degree." Buck v. U.S. Fidelity & Guar. Co., 265 N.C. 285, 290, 144 S.E.2d 34, 37 (1965) (quoting 50 Am. Jur. Statutes § 223) (internal quotation marks omitted).

This court first notes that it does not consider the Equal Protection Clause itself to provide a proper basis for Plaintiff's § 99D-1 claim. The Equal Protection Clause of the Fourteenth Amendment creates a private right to be free from state action that intentionally discriminates based on a suspect classification. See, e.g., United States v. Virginia, 518 U.S. 515, 536 (1996) (looking to "the actual purpose underlying the discriminatory classification") (quoting Miss. Univ. for Women v. Hogan, 458 U.S. 718, 730 (1982)); McCleskey v. Kemp, 481 U.S. 279, 292 (1987) ("[A] defendant who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination.") (internal quotation marks omitted). Duke is not a state actor and Plaintiff does not plausibly allege that Duke intentionally discriminated against Plaintiff on the basis of sex or any other protected ground.

Regarding Title IX, N.C. Gen. Stat. § 99D-1 requires that the conspiracy be "motivated by race, religion, ethnicity, or gender." See Radcliffe v. Avenel Homeowners Ass'n, ____ N.C. App. ____, ____, 789 S.E.2d 893, 905 (2016). Title IX further provides a right only to be free from discrimination "on the basis of sex." 20 U.S.C. § 1681. As previously discussed, Plaintiff has not plausibly alleged that any agreement was motivated by her gender as opposed to a more obvious motivating factor; namely, Broderick's personal animus against Plaintiff. For that reason, it appears to this court that Plaintiff was not denied any right under Title IX. However, even assuming Plaintiff was denied such a right, this court finds that Title IX does not "impact on" a constitutional right within the meaning of § 99D-1.

Because almost any statute can potentially be said to impact on a constitutional provision in some tangential way, this court declines to give "impacts on" the broad meaning Plaintiff suggests. It defies logic to believe that the North Carolina legislature intended to create such a broad remedy, especially when many federal and state laws contain their own individualized enforcement provisions. See, e.g., 42 U.S.C. § 2000e-5. It would be odd, to say the least, if the North Carolina legislature intended to permit plaintiffs to bypass

federal statutory procedures and sue directly under N.C. Gen. Stat. § 99D-1 merely because Title IX arguably "impacts on" the constitutional guarantee of equal protection.

This court believes that the most natural reading of N.C. Gen. Stat. § 99D-1 is that the statute is intended to cover explicit constitutional guarantees and statutes that, by their language, enforce or interpret such guarantees. The crucial question for Plaintiff's § 99D-1 claim is whether Title IX enforces substantive rights granted by the Equal Protection Clause or is merely related to the Equal Protection Clause. This question, in turn, can only be answered by determining the constitutional provision under which Congress passed Title IX; that is, whether Congress passed Title IX pursuant to § 5 of the Fourteenth Amendment to define and enforce substantive rights granted by the Equal Protection Clause, or pursuant to the Article I, Section 8 Spending Clause to address discrimination by private institutions that receive federal funding.

Courts have approached this question differently,[9] finding alternatively that Title IX has its origins in the Spending Clause or that Title IX guarantees substantive rights found in the Equal Protection Clause. See generally, David S. Cohen, Title IX: Beyond Equal Protection, 28 Harv. J. L. & Gender 217, 234 (2005). In Gebser, the Supreme Court stated that Congress decided to "attach[] conditions to the award of federal funds under its spending power" in passing Title IX. 524 U.S. at 287. Lower courts generally follow this position, finding that "Congress enacted Title IX pursuant to its powers under the Spending Clause . . . [,] [e]ven if there is some ambiguity injected into the inquiry by the fact that Title IX addresses subject matter covered by the Fourteenth Amendment." Litman v. George Mason Univ., 5 F. Supp. 2d 366, 373 (E.D. Va. 1998). This

---

[9] These decisions arise mainly in the sovereign immunity context, where the origin of the statute becomes relevant to determine whether Congress has abrogated Eleventh Amendment state sovereign immunity. Congress can do this either by acting within its Equal Protection power or by forcing states to waive immunity to receive funds. However, the relevant inquiry under the Equal Protection Clause is only whether Congress could have passed the statute in question under this provision, as authority alone is sufficient to abrogate immunity. See, e.g., Franks v. Ky. Sch. for the Deaf, 142 F.3d 360, 363 (6th Cir. 1998). Many of these courts do not consider whether Congress in fact acted pursuant to the Equal Protection Clause or the Spending Clause, which is the critical question here to determine whether Title IX interprets or enforces pre-existing constitutional rights in order to interpret North Carolina law.

court agrees[10] with the Litman court and finds that Title IX was enacted pursuant to powers under the Spending Clause to reach a self-selecting group of private educational programs or activities that choose to receive federal funding.

As the Litman court notes, Title IX differs from the Equal Protection Clause in that "Title IX is voluntary in nature [and a] state agency can discriminate if it chooses to forego federal funds." Id. at 373. Further, "Congress' power under § 5 of the Fourteenth Amendment is limited to enforcing the substantive guarantees of the Fourteenth Amendment [and it] is well settled law that the Equal Protection Clause only protects against action by state-sponsored entities." Id.; see also City of

---

[10] While the Litman court asserts that "the substantive provisions of Title IX reach beyond the Fourteenth Amendment's prohibitions against gender discrimination" by prohibiting disparate-impact discrimination, 5 F. Supp. 2d at 373-74, this court does not reach the same conclusion. The Equal Protection Clause itself protects only against state action motivated by a discriminatory purpose (which may be inferred from effect alone). See, e.g., McCleskey, 481 U.S. at 297-98. Although there appears to be some debate regarding the exact scope of Title IX, the Supreme Court has held that the analogous Title VI creates no private right to recover based on disparate impact, see Alexander v. Sandoval, 532 U.S. 275, 283-84, 293 (2001), and that Title IX bans "intentional discrimination on the basis of sex." Jackson, 544 U.S. at 173. Lower courts have generally interpreted these holdings to mean that "a Title IX claim may not be premised on the 'disparate impact' a policy has with respect to a protected group." Doe v. Brown Univ., 166 F. Supp. 3d 177, 184 (D.R.I. 2016). Nevertheless, this court finds that the application of anti-discrimination laws to a self-selecting group of private institutions is strong proof that Title IX is a Spending Clause statute.

Boerne v. Flores, 521 U.S. 507, 519 (1997) (finding that the
enforcement power granted by § 5 of the Fourteenth Amendment is
limited to enforcing substantive provisions of that amendment
against state actors; noting that "Congress does not enforce a
constitutional right by changing what the right is"). Therefore,
Congress could not have constitutionally passed a law that
applies to private entities, such as Title IX, pursuant to § 5
of the Fourteenth Amendment. This court is convinced that, while
Title IX certainly deals with similar subject matter as the
Equal Protection Clause, it does not substantively alter or
impact on the rights granted by this clause and is thus
primarily a Spending Clause statute designed to reach a self-
selecting universe of educational programs or activities that
receive federal funding.

Plaintiff must identify either a specific constitutional
right that is interfered with by the alleged conspiracy or
identify a federal or state law whose primary purpose is to
interpret or enforce substantive rights granted by the
constitution. Here, Plaintiff identifies only Title IX and its
relationship to the Equal Protection Clause. Because Title IX is
a voluntary legal regime that applies to private educational
programs and activities, Title IX does not enforce or interpret
the Equal Protection Clause. Plaintiff fails to show that Title

IX "enforces, interprets, or impacts on a constitutional right" and fails to show that Defendants have interfered with any right granted by either Title IX or the Equal Protection Clause. Therefore, Plaintiff fails to state a claim under N.C. Gen. Stat. § 99D-1 and Defendants' motions to dismiss this claim will be granted.

## V.    <u>BREACH OF CONTRACT</u>

Plaintiff argues that, by failing to provide counseling and other services in the aftermath of Plaintiff's alleged rape, Duke breached both express promises contained in its educational contract with Plaintiff and the implied covenant of good faith and fair dealing.

Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." <u>Poor v. Hill</u>, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). "A valid contract exists when there is an agreement based on a meeting of the minds and sufficient consideration." <u>Elina Adoption Servs., Inc. v. Carolina Adoption Servs., Inc.</u>, No. 1:07CV169, 2008 WL 4005738, at *3 (M.D.N.C. Aug. 25, 2008). "If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement." <u>Croom v. Goldsboro Lumber Co.</u>, 182 N.C. 217, 217, 108 S.E. 735, 737 (1921). North

Carolina courts have consistently held that "a contract must be sufficiently definite in order that a court may enforce it." Brooks v. Hackney, 329 N.C. 166, 170, 404 S.E.2d 854, 857 (1991).

Unilateral manuals and policy handbooks produced by an employer or university are not independent contracts and do not become a part of any contract unless expressly included. See, e.g., Giuliani v. Duke Univ., No. 1:08CV502, 2010 WL 1292321, at *7-8 (M.D.N.C. Mar. 30, 2010); Black v. W. Carolina Univ., 109 N.C. App. 209, 213, 426 S.E.2d 733, 736 (1993); Walker v. Westinghouse Elec. Corp., 77 N.C. App. 253, 259-60, 335 S.E.2d 79, 83-84 (1985) ("[T]he law of North Carolina is clear that unilaterally promulgated employment manuals or policies do not become part of the employment contract unless expressly included in it."); see also Montessori Children's House of Durham v. Blizzard, 244 N.C. App. 633, 640-41, 781 S.E.2d 511, 517 (2016) (rejecting a breach of contract claim based on "statements contained on a private school's webpage or in its advertisements that are not expressly incorporated by reference into a contract for admission").

In Ryan v. University of North Carolina Hospitals, 128 N.C. App. 300, 494 S.E.2d 789 (1998), a medical resident at the University of North Carolina hospital system brought a breach of

contract action against the university for allegedly failing to fulfill promises made in the residency contract, including a promise that the plaintiff would be permitted a one-month rotation in the gynecology department. 128 N.C. App. at 301–03, 494 S.E.2d at 790–91. The North Carolina Court of Appeals refused to conduct a general "inquiry into the nuances of educational processes and theories," but found that the plaintiff had stated a claim for the breach of any specific covenants in the contract (namely, the gynecology rotation provision). Id. at 302, 494 S.E.2d at 791 (quoting Ross v. Creighton Univ., 957 F.2d 410, 417 (7th Cir. 1992)). The court cited approvingly to Ross, where the Seventh Circuit held that a student plaintiff "must do more than simply allege that the education was not good enough" and "must point to an identifiable contractual promise that the defendant failed to honor." 957 F.2d at 416–17; see also id. (finding that the plaintiff had stated a breach of contract claim by alleging the university breached specific promises to provide a tutor).

Every valid contract contains an implied covenant of good faith and fear dealing, pursuant to which the parties "promise not to do anything to the prejudice of the other inconsistent with their contractual relation." Tillis v. Calvine Cotton Mills, Inc., 251 N.C. 359, 363, 111 S.E.2d 606, 610 (1959); see

also <u>Bicycle Transit Auth., Inc. v. Bell</u>, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985).

Here, Plaintiff fails to specify the source of the contractual promises allegedly breached by Duke. Plaintiff alleges that Duke promises to provide "an array of gender violence intervention and counselling services for any student that is subjected to sexual violence." (Am. Compl. (Doc. 20) ¶ 73.) Plaintiff argues in her response brief that Duke's motion to dismiss this claim should be denied because she "has pointed to two specific, identifiable contractual promises that Duke failed to honor"; presumably, the promise to provide "educational and related services" requested by Plaintiff and the covenant of good faith and fair dealing. (Pl.'s Duke Resp. (Doc. 37) at 13.) However, Plaintiff has not produced a copy of any alleged educational contract, or any other document signed by the parties, in which Duke agrees to provide these services. Crucially, Plaintiff fails to sufficiently allege that the promise to provide counselling services formed part of the tuition contract itself, rather than a unilateral promise by Duke through some other medium. <u>See</u> <u>Boyce v. McMahan</u>, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974) (stating that "a contract, or offer to contract, leaving material portions open for future agreement is nugatory and void for indefiniteness").

Plaintiff's failure to produce a copy of the actual contract between the parties and point to a specific commitment is fatal to her breach of contract claim. This court will not infer a specific contractual covenant without more, even at the motion to dismiss stage. To do so would be to sanction broad judicial "inquiry into the nuances of educational processes and theories." Ryan, 128 N.C. App. at 302, 494 S.E.2d at 791. The North Carolina courts have expressly limited application of the Ryan holding to cases where there is an explicit, identifiable contractual promise. See Blizzard, 244 N.C. App. at 641–42, 781 S.E.2d at 517. Plaintiff has identified no specific promise related to counselling or any other gender violence support services. Therefore, this court finds that Plaintiff has failed to allege the existence of a valid contract containing this covenant. Plaintiff's claim for breach of the implied covenant of good faith and fair dealing must also fail, because this covenant is implied only where a valid contract exists.[11] Duke's

---

[11] To state a claim for breach of the covenant of good faith and fair dealing, Plaintiff must plausibly allege that Defendants' conduct injured her right to receive benefits of an existing contractual arrangement. See Heron Bay Acquisition, LLC v. United Metal Finishing, Inc., 245 N.C. App. 378, 385–86, 781 S.E.2d 889, 894–95 (2016). For Plaintiff to prove she was denied such a benefit, she would still need to produce a contract and that contract would need to contain a provision relating to psychological or counselling services.

motion to dismiss Plaintiff's breach of contract claim will be granted.

## VI. <u>UNFAIR AND DECEPTIVE TRADE PRACTICES (UDTP)</u>

To state a claim for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1, "a plaintiff must show (1) an unfair or deceptive act or practice . . . (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff." <u>Spartan Leasing Inc. v. Pollard</u>, 101 N.C. App. 450, 460, 400 S.E.2d 476, 482 (1991); <u>see also</u> <u>Bumpers v. Cmty. Bank of N. Va.</u>, 367 N.C. 81, 102-03, 747 S.E.2d 220, 235 (2013) (stating that actual reliance on the unfair practice to make a purchase is not necessary). While a plaintiff is not required to prove fraud, bad faith, or actual deception, she must show that the practice "has the capacity or tendency to deceive the average consumer." <u>Pollard</u>, 101 N.C. App. at 461, 400 S.E.2d at 482; <u>see also</u> <u>Chastain v. Wall</u>, 78 N.C. App. 350, 356, 337 S.E.2d 150, 153-54 (1985) ("Even a truthful statement can be deceptive, if it has the capacity or tendency to deceive."); <u>Overstreet v. Brookland, Inc.</u>, 52 N.C. App. 444, 452-53, 279 S.E.2d 1, 7 (1981).

"Whether a trade practice is unfair or deceptive usually depends upon the facts of each case and the impact the practice has in the marketplace." <u>Marshall v. Miller</u>, 302 N.C. 539, 548,

276 S.E.2d 397, 403 (1981). "Simple breach of contract or failure to pay a debt" are not considered deceptive trade practices within the scope of the statute, unless accompanied by "some type of egregious or aggravating circumstances." Norman Owen Trucking, Inc. v. Morkoski, 131 N.C. App. 168, 177, 506 S.E.2d 267, 273 (1998). "A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Marshall, 302 N.C. at 548, 276 S.E.2d at 403.

To be cognizable, an unfair practice must affect commerce. N.C Gen. Stat. § 75-1.1 states that "commerce includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." The North Carolina Supreme Court has held that § 75-1 is intended to "regulate two types of interactions in the business setting: (1) interactions between businesses, and (2) interactions between businesses and consumers," but not "a business's internal operations." White v. Thompson, 364 N.C. 47, 53, 691 S.E.2d 676, 679-80 (2010). Specifically, § 75-1 does not apply to employer-employee relations or to securities transactions because these activities are governed by separate

regulatory schemes. HAJMM Co. v. House of Raeford Farms, Inc., 328 N.C. 578, 593-94, 403 S.E.2d 483, 492-93 (1991).

### A.  **UDTP Claim against Duke**

Here, Plaintiff alleges that Duke engaged in unfair and deceptive trade practices by publicizing counselling services for victims of sexual violence and then denying Plaintiff access to these services after Plaintiff's alleged rape.

Duke argues that Plaintiff's claims are outside the scope of the statute because they relate only to the university's internal operations and do not affect commerce. (Def. Duke's Mem. (Doc. 30) at 25.) This court does not find the cases cited by Duke to be entirely persuasive. These cases deal either with employer-employee relationships, see Durling v. King, 146 N.C. App. 483, 554 S.E.2d 1 (2001), or with alleged unfair practices by educational institutions that are fundamentally different from the provision of counselling services, see Johnson v. Schmitz, 119 F. Supp. 2d 90, 103 (D. Conn. 2000) (stating that plaintiff brought a UDTP claim against other university professors who allegedly misappropriated his ideas); Trustees of Bos. Univ. v. ASM Commc'ns, Inc., 33 F. Supp. 2d 66, 77 (D. Mass. 1998)(evaluating a claim related to a university's investigative purchase of term papers from online "paper mills"). Here, Plaintiff appears to allege that Duke deceptively

advertised or promised counselling and other sexual violence support services, which are wholly within the university's core mission of educating students and do not involve commercial or competitive aspects.

Because North Carolina does not recognize a claim for educational malpractice, see, e.g., Ryan, 128 N.C. App. at 300, 494 S.E.2d at 790, this court must first determine whether Plaintiff's § 75-1 claim is in fact a malpractice claim disguised as a UDTP claim. See Arnold v. Univ. of N.C. at Chapel Hill, No. COA16-573, 2017 WL 1382212, at *3 (N.C. Ct. App. 2017) (finding that a UDTP claim alleging that the university misled applicants about the quality of education they would receive was "an attempt to reframe what are actually educational malpractice claims"). North Carolina expressly rejects educational malpractice and open-ended inquiries into the sufficiency of the educational process. See Supplee v. Miller-Motte Bus. Coll., Inc., 239 N.C. App. 208, 218–19, 768 S.E.2d 582, 591–92 (2015) (discussing the holdings in Ryan and Ross). Counselling services are integrally related to the educational process and to student wellbeing, and this court ultimately finds that Plaintiffs § 75-1 claim merely reframes her breach of educational contract

claim.[12] See, e.g., Roe v. Saint Louis Univ., No. 4:08CV1474 HEA, 2012 WL 6757558, at *10-11 (E.D. Mo. Dec. 31, 2012) (rejecting a UDTP claim under Missouri law because examining the quality of medical care plaintiff received from the university "would require the Court to inquire into the nuances of educational processes and theories"). Therefore, this claim is barred by the educational malpractice doctrine and Duke's motion to dismiss this claim will be denied.

Even assuming for argument that Plaintiff is alleging unfair and deceptive trade practices and not merely repackaging her breach of contract claim, these allegations are not within the scope of § 75-1. The question of whether the interaction between a university and its students is similar enough to the business-consumer relationship envisioned by the North Carolina state legislature, see White, 364 N.C. at 51-52, 691 S.E.2d at 679, to bring it within § 75-1 is best addressed by analogy to the market-participant doctrine. When a state acts as a market participant rather than a governing sovereign by, for example,

---

[12] This conclusion is bolstered by the fact that Plaintiff points to no marketing materials or statements that explicitly promise certain counselling services to Duke students, merely reincorporating her earlier allegations. (See Am. Compl. (Doc. 20) ¶¶ 81-83.) Absent such evidence, permitting Plaintiff's § 75-1 claim to go forward would sanction exactly the type of inquiry into educational sufficiency that North Carolina courts have consistently refused to undertake. E.g., Ryan, 128 N.C. App. at 302, 494 S.E.2d at 791.

selling products itself rather than subsidizing private companies, it is not subject to the restrictions of the dormant commerce clause. See, e.g., Reeves, Inc. v. Stake, 447 U.S. 429, 436-38 (1980) ("There is no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market."). Universities perform purely commercial functions; for example, they negotiate with suppliers for items such as textbooks, construction services, and classroom equipment and sell university apparel to the public. When universities educate students, they perform a fundamentally different role. Although this relationship is also governed by contract, it is not purely commercial in nature. It follows that a university is not subject to the same restrictions regarding deceptive trade practices when it is within the bounds of this central educational mission as when it sells T-shirts.

Here, Plaintiff has presented no evidence that the deceptive or unfair practices she alleges were related to any commercial activity performed by Duke outside of its educational mission. Rather, Plaintiff merely argues that the relationship between a university and its students is sufficiently "commercial" in nature to bring it within the statute. (See Pl.'s Duke Resp. (Doc. 37) at 15 ("Duke's provision of an array of services to its students (for a substantial fee) and others

is a primary 'business activity' of Duke University").) Where
the only relationship at issue is the university-student
relationship, and there is no "practice that was deceptive to
the general public," there can be no consumer-oriented deception
of the type that § 75-1 is intended to prevent. See Prasad v.
Cornell Univ., Civil Action No. 5:15-cv-322, 2016 WL 3212079, at
*21-22 (N.D.N.Y. Feb. 24, 2016). Therefore, Plaintiff fails to
state a claim under N.C. Gen. Stat. § 75-1 against Duke, and
Duke's motion to dismiss that claim will be granted.

### B.   **UDTP Claim against Broderick**

N.C. Gen. Stat. § 75-1 expressly excludes from its scope
"professional services rendered by a member of a learned
profession." N.C. Gen. Stat. § 75-1.1(b). Broderick argues, in
support of her motion to dismiss, that she "is excluded from the
purview of the Act because she is a medical professional" and
thus provides services that are outside of ordinary commerce.
(Doc. 27 at 11.) North Carolina courts agree "that unfair and
deceptive acts committed by medical professionals are not
included within the prohibition of N.C.G.S. § 75-1.1(a)." Gaunt
v. Pittaway, 139 N.C. App. 778, 783-84, 534 S.E.2d 660, 664
(2000). Plaintiff responds, in summary, that the Complaint does
not identify Broderick as a counselor or medical professional,
that counselors do not fall within the statutory exclusion, and

- 41 -

that the allegations are not based on Broderick's conduct <u>as a counselor</u> because Broderick in fact refused to render any counselling services to Plaintiff. (Pl.'s Opp'n to Broderick's Mot. to Dismiss ("Pl.'s Broderick Resp.") (Doc. 39) at 10–11.)

North Carolina courts have drawn a clear line between (1) professional services rendered in connection with medical advice or an opinion about proper medical care, and (2) representations made by a hospital or doctor during business negotiations. <u>Compare</u> <u>Gaunt</u>, 139 N.C. App. at 779–80, 784, 534 S.E.2d at 661, 664 (finding that a doctor's opinion about another doctor's medical practice that was published in a newspaper was exempt from § 75-1), <u>and</u> <u>Shelton v. Duke Univ. Health Sys., Inc.</u>, 179 N.C. App. 120, 121, 633 S.E.2d 113, 114 (2006) (finding that a hospital's provision of allegedly misleading billing information was exempt), <u>with</u> <u>Hamlet H.M.A., LLC v. Hernandez</u>, ____ N.C. App. ____, ____, 821 S.E.2d 600, 606–08 (2018) ("Defendant alleged that the hospital made false representations to induce him to enter into a contract; the fact that he is a physician does not change the nature of the negotiation of a business contract."). Statements about medicine, treatment or billing are protected by the "learned profession" exclusion to § 75-1, while statements made by doctors outside of those categories (such as during business negotiations) are not.

Here, Plaintiff has not alleged that Broderick made statements or engaged in conduct that was related in any way to her professional occupation. Because Broderick allegedly failed to provide counselling services to Plaintiff, it naturally follows that Broderick is not protected by the "learned profession" exclusion notwithstanding that she may in fact be a learned professional.

However, Plaintiff still confronts the insurmountable obstacle of showing that Broderick's conduct was "in or affecting commerce," as required by the statute. Plaintiff's § 75-1 claim against Broderick is on an even more tenuous foundation than Plaintiff's claim against Duke, because there was simply no direct commercial relationship between Plaintiff and Broderick. While Plaintiff was in a contractual relationship with Duke, she was certainly not in a direct contractual relationship with Broderick and there is nothing to suggest that Plaintiff's relationship with Broderick was analogous to that of a buyer and seller. See Prince v. Wright, 141 N.C. App. 262, 268-69, 541 S.E.2d 191, 197 (2000) ("[T]he fundamental purpose of G.S. § 75-1.1 is to protect the consuming public.") (internal quotation marks omitted). Plaintiff was certainly not in the consumer-like position of deciding among multiple counselling

service providers, as Duke apparently had only one gender violence coordinator.[13]

Plaintiff argues that "Ms. Broderick was employed by Duke to coordinate the delivery of its gender violence intervention services" and that the relationship was "essentially contractual in nature." (Pl.'s Broderick Resp. (Doc. 39) at 12.) But this argument is merely an effort to re-package the allegations against Duke as a separate claim against Broderick. If Plaintiff has a § 75-1 claim against any Defendant, it is certainly the defendant with which she was in a direct contractual relationship (and not an employee of that entity). Plaintiff fails to plausibly allege that Broderick's conduct affected commerce within the meaning of § 75-1; for that reason, Plaintiff fails to state a claim against Broderick for unfair and deceptive trade practices. Broderick's motion to dismiss Plaintiff's § 75-1 claim will be granted.

## VII. <u>INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

"The essential elements of an action for intentional infliction of emotional distress are 1) extreme and outrageous conduct by the defendant 2) which is intended to and does in

---

[13] This appears to be a reasonable conclusion based on the fact that Duke referred Plaintiff outside of the university rather than reassigning Plaintiff to a different coordinator. (Am. Compl. (Doc. 20) ¶ 24.)

fact cause 3) severe emotional distress." <u>Waddle</u>, 331 N.C. at 82, 414 S.E.2d at 27 (internal quotation marks omitted). North Carolina uses the same standard for "severe emotional distress" in IIED cases as in negligent infliction of emotional distress ("NIED") claims. <u>Id.</u> at 83, 414 S.E.2d at 27. Namely, "'severe emotional distress' means any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." <u>Johnson v. Ruark Obstetrics & Gynecology Assocs.</u>, 327 N.C. 283, 304, 395 S.E.2d 85, 97 (1990).

Conduct is extreme and outrageous only when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." <u>Briggs v. Rosenthal</u>, 73 N.C. App. 672, 677, 327 S.E.2d 308, 311 (1985) (citing Restatement (Second) of Torts § 46 cmt. d). The law does not provide a remedy for "rough language, [or for] occasional acts that are definitely inconsiderate or unkind." <u>Hogan v. Forsyth Country Club. Co.</u>, 79 N.C. App. 483, 493, 340 S.E.2d 116, 123 (1986); <u>see also</u> <u>Guthrie v. Conroy</u>, 152 N.C. App. 15, 23–24, 567 S.E.2d 403, 410 (2002) (rejecting an IIED

claim for alleged sexual touching and crude sexual remarks; stating that "defendant Conroy's alleged behavior, while annoyingly juvenile, obnoxious, and offensive, does not rise to the level of outrageous and extreme").

Under certain circumstances, North Carolina courts have held that sexual assault or crude sexual comments and physical touching over a lengthy period of time constitutes extreme and outrageous conduct. See Watson v. Dixon, 130 N.C. App. 47, 48-49, 53, 502 S.E.2d 15, 17–18, 20 (1998) (upholding a verdict for the plaintiff and finding that the harassment by defendant — including groping, obscene comments, threatening behavior, and prank calls — was supported by the evidence and sufficiently extreme and outrageous); Hogan, 79 N.C. App. at 490–91, 340 S.E.2d at 121 (reversing grant of summary judgment for the defendant, where the plaintiff alleged that the defendant supervisor made sexual advances, groped her, and threatened her with a knife); but see Wilson v. Bellamy, 105 N.C. App. 446, 468, 414 S.E.2d 347, 359 (1992) (rejecting the plaintiff's IIED claim where the defendant allegedly kissed and groped the plaintiff at a public event while she was drunk and unconscious; stating that "we are unwilling to hold on this record that a sexual battery, standing alone, constitutes the required extreme and outrageous conduct").

Outside of sexual misconduct, harassment generally rises to the level of "extreme and outrageous" when it involves multiple serious threats and instances of harassment over a years-long period. See, e.g., Radcliffe, 789 S.E.2d at 909 ("[T]he individual Defendants perpetuated a prolonged multi-year campaign of harassment, threats, and abuse that grossly exceeded the bounds of propriety."); Wilson v. Pearce, 105 N.C. App. 107, 115–16, 412 S.E.2d 148, 152 (1992) (upholding an IIED verdict where the defendants "cursed and threatened plaintiffs, reported them [for false legal violations] . . . threw items into plaintiffs' yard, made obscene gestures to plaintiffs and their children and generally disturbed their peace" over an almost ten-year period).

Under North Carolina law, severe emotional distress occurs "only where the distress inflicted is so severe that no reasonable man could be expected to endure it." Waddle, 331 N.C. at 84, 414 S.E.2d at 27–28 (emphasis omitted). "Proof of severe emotional distress does not necessarily require medical evidence or testimony." Pacheco v. Rogers and Breece, Inc., 157 N.C. App. 445, 450, 579 S.E.2d 505, 508 (2003). However, the plaintiff must allege a medical condition recognized by North Carolina law, see Ruark Obstetrics, 327 N.C. at 304, 395 S.E.2d at 97, and, ultimately, must provide some verification that he or she

actually suffers from such a condition as a result of the defendant's conduct. See Coffman v. Roberson, 153 N.C. App. 618, 627–28, 571 S.E.2d 255, 261 (2001).

### A.  IIED Claim Against Bishop

Plaintiff alleges that Bishop raped and sexually assaulted her. (Am. Compl. (Doc. 20) ¶ 12.) Plaintiff further alleges that, upon confronting Bishop after the rape, Bishop "went into a rage" and threatened Plaintiff, stating that his girlfriend (Broderick) would block any effort by Plaintiff to report the rape within Duke and "would take steps to destroy Plaintiff's personal and professional reputation and credibility." (Id. ¶¶ 15–16.) Plaintiff states that Bishop continued to harass her, (id. ¶ 18), that Bishop was involved in making false stalking claims against Plaintiff in retaliation for her decision to report the rape, (id. ¶ 43), and that Bishop enlisted a Duke police officer to make false statements against Plaintiff in a legal proceeding. (Id. ¶¶ 36–40.) In addition, Plaintiff states that Bishop induced another Duke student to lodge a baseless complaint against Plaintiff. (Id. ¶ 41.)

This court finds the alleged conduct by Bishop to be "extreme and outrageous" and "utterly intolerable in a civilized community." North Carolina courts have consistently held that a pattern of sexually inappropriate workplace behavior may

constitute extreme and outrageous conduct. See, e.g., Watson,
130 N.C. App. at 49–50, 502 S.E.2d at 17–18. The alleged actions
by Bishop (while admittedly outside of the employment context)
go far beyond lewd jokes or groping and are also more serious
that the conduct at issue in Bellamy. In Bellamy, the North
Carolina Court of Appeals found no basis for an IIED claim in
the defendant's kissing and fondling of a drunk and
incapacitated woman, noting that "sexual battery" alone did not
support a claim for IIED. Bellamy, 105 N.C. App. at 468, 414
S.E.2d at 359. Plaintiff's allegations that Bishop raped her,
threatened her, and then helped to orchestrate a far-reaching
campaign to impugn her reputation, on the other hand, are wholly
within the realm of "extreme and outrageous conduct."

As Bishop does not appear to dispute the causation element,
this court finds no need to conduct a detailed examination into
whether a rape and subsequent harassment campaign can plausibly
create severe emotional distress.

Plaintiff has further alleged that, due to Bishop's
actions, she "has suffered severe and disabling emotional
conditions that are recognized and diagnosable by professionals
. . . including but not limited to adjustment disorder, stress
related peripheral nervous dysfunction, autoimmune flares, [and]
suicidal ideation." (Am. Compl. (Doc. 20) ¶ 91.) Plaintiff is

- 49 -

not required at this stage to provide medical verification of these conditions.[14] Cf. Pacheco, 157 N.C. App. at 449–50, 579 S.E.2d at 508–09 (stating that "real evidence" of severe emotional distress is required at the summary judgment stage). Rather, it is sufficient that Plaintiff alleges she suffers from such conditions because of Bishop's actions. Plaintiff alleges she has in fact received, and continues to receive, treatment for the conditions listed in the Complaint. (Am. Compl. (Doc. 20) ¶ 91.) Therefore, this court finds that Plaintiff has plausibly alleged severe emotional distress under North Carolina law.[15] Plaintiff has stated a claim for IIED against Bishop and Bishop's motion to dismiss this claim will be denied.

### B.  IIED Claim against Broderick

Plaintiff alleges that Broderick: (1) made false complaints to the Duke University Police Department accusing Plaintiff of

---

[14] Bishop argues that Plaintiff has failed to sufficiently plead this element but cites to a case that stands merely for the proposition that alleging "severe emotional distress" with no elaboration is conclusory. See Horne v. Cumberland Cty. Hosp. Sys., Inc., 228 N.C. App. 142, 149, 746 S.E.2d 13, 20 (2013). Plaintiff goes further by identifying specific mental disorders. Bishop also inexplicably asserts that the Complaint is "devoid of any allegations that Plaintiff has received any type of treatment or counseling," (Doc. 32 at 10), when the Complaint does make exactly such an allegation, (see Am. Compl. (Doc. 20) ¶ 91.)

[15] This inquiry is the same for each Defendant, and this court will not re-examine the sufficiency of Plaintiff's emotional distress allegations in the remainder of this section.

stalking Broderick, (2) disclosed sensitive information from Plaintiff's university records and Plaintiff's letter seeking help in the aftermath of an alleged rape, and (3) collected information regarding Plaintiff and disseminated that information with the intent of destroying Plaintiff's reputation both within Duke and in the medical community at large. (Am. Compl. (Doc. 20) ¶¶ 16, 26, 32, 43, 47–48.)

This court finds the allegations against Broderick are exacerbated by the fact that Broderick was supposed to provide Plaintiff with counselling and other sensitive medical and social services in her role as Duke's Gender Violence Coordinator. North Carolina courts have used "an unfair power relationship between defendant and plaintiff" as a factor in evaluating IIED claims. Guthrie, 152 N.C. App. at 23, 567 S.E.2d at 409. Here, this court finds that Plaintiff was especially vulnerable following the alleged assault and that Broderick allegedly abused her position of power within the university to take advantage of this vulnerability. See, e.g., DeBacker v. City of Moline, 78 F. Supp. 3d 916, 930 (C.D. Ill. 2015) (applying Illinois law, finding that the defendant's awareness of plaintiff's "mental distress" made the alleged conduct more serious and extreme).

This court ultimately finds that the alleged acts by
Broderick are, individually, insufficient to constitute extreme
and outrageous conduct; however, when taken together, these
actions could plausibly rise to such a level. Making false
statements to or lodging false complaints with police or law
enforcement is ordinarily not extreme or beyond "all bounds of
decency tolerated by society."[16] See Chidnese v. Chidnese, 210
N.C. App. 299, 317, 708 S.E.2d 725, 738–39 (2011) (collecting
cases). Campaigns of harassment and intimidation that stretch
over a period of years can be sufficient to state a claim, e.g.,
Pearce, 105 N.C. App. at 115–17, 412 S.E.2d at 152–53, but
normally involve direct personal threats made to the plaintiff
by the defendant. See, e.g., Radcliffe, 789 S.E.2d at 908–09
(stating that the defendants continuously shouted threats and
insults, broke into the plaintiff's home, and physically beat
the plaintiff). And the intentional disclosure of confidential
information, standing alone, has been found to fall short of the
extreme conduct required for IIED. See DeBacker, 78 F. Supp. 3d
at 929 (stating that the city's disclosure of a police officer's
"confidential mental health information" to the media did not
make the city liable for IIED).

---

[16] Such conduct may, however, give rise to a malicious
prosecution claim, which Plaintiff has not alleged. Chidnese,
210 N.C. App. at 317, 708 S.E.2d at 738.

Here, however, the sum of Broderick's conduct potentially rises to a level beyond "all bounds of decency tolerated by society." This court is especially disturbed by the alleged use of confidential university records to impugn Plaintiff and the disclosure of Plaintiff's purportedly confidential sexual assault report, especially the disclosure of this information to the individual whom Broderick knew to be the alleged perpetrator of the assault on Plaintiff. (See Am. Compl. (Doc. 20) ¶ 16.)

Plaintiff additionally alleges that Broderick engaged in a campaign to impugn her reputation. (See id. ¶¶ 47-48.) Plaintiff does not allege that Broderick ever threatened her personally; in fact, it does not appear from the Complaint that the two ever met in person. However, Plaintiff's allegations are sufficient to plausibly suggest that Broderick engaged in extreme and outrageous conduct within the meaning of the law and warrant further discovery regarding Broderick's actions. For that reason, Broderick's motion to dismiss Plaintiff's IIED claim will be denied.

### C.  **IIED Claim against Duke**

Because Plaintiff does not allege that Duke itself, through any senior officials or administrators, engaged in extreme and outrageous conduct, Plaintiff's IIED claim against Duke is based solely on the alleged actions of the university's employee and

agent, Broderick.[17] For Duke to be liable based on the actions of its agent, the agent herself must be liable for the alleged tort. See Guthrie, 152 N.C. App. at 24, 567 S.E.2d at 410; Denning-Boyles v. WCES, Inc., 123 N.C. App. 409, 415, 473 S.E.2d 38, 42 (1996). An employer (or principal) is liable for an intentional tort committed by its employee (or agent) only "(1) when the agent's act is expressly authorized by the principal; (2) when the agent's act is committed within the scope of his employment and in furtherance of the principal's business; or (3) when the agent's act is ratified by the principal." Hogan, 79 N.C. App. at 491, 340 S.E.2d at 121.

As there is no indication that Duke explicitly authorized Broderick's actions or that Broderick harassed Plaintiff in furtherance of any objective associated with her official duties, Plaintiff can state a claim against Duke only under a theory of ratification. Plaintiff alleges that "Ms. Broderick's supervisors . . . ratified and condoned Ms. Broderick's retaliatory conduct" by failing to respond to reports about Broderick's behavior. (Am. Compl. (Doc. 20) ¶¶ 49-50.) This

---

[17] Plaintiff also alleges that another Duke employee and colleague of Broderick, Christine Pesetski, "interrogated" Plaintiff about her interactions with Bishop, (Am. Compl. (Doc. 20) ¶ 29), and that a Duke police officer gave false statements regarding Plaintiff. (Id. ¶¶ 35-37.) While certainly troubling, these allegations do not approach the level of extreme and outrageous conduct that is required in the IIED context.

court is not bound by such legal conclusions. E.g., Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). To ratify an employee's tortious actions, "it must be shown that the employer had knowledge of all material facts and circumstances relative to the wrongful act, and that the employer, by words or conduct, show[ed] an intention to ratify the act." Hogan, 79 N.C. App. at 492, 340 S.E.2d at 122.

Here, this court finds that Plaintiff has not plausibly alleged that Duke had knowledge of all material facts related to Broderick's conduct. Plaintiff alleges that a colleague of Broderick heard Broderick express a desire to "destroy Plaintiff's reputation" and refer to documents that Broderick had collected for this purpose. (Am. Compl. (Doc. 20) ¶¶ 47-48.) This colleague then reported the interaction and "Ms. Broderick's past and planned retaliation against Plaintiff" to Duke officials. (Id. ¶ 49.) Plaintiff does not allege, however, that this colleague knew which specific documents Broderick had gathered or knew that Broderick had allegedly accessed and disclosed confidential information about Plaintiff to Duke

colleagues and to Bishop.[18] There is also nothing to suggest that this colleague knew Broderick had allegedly made stalking claims against Plaintiff and that those claims were false. Therefore, the colleague could not have imparted this information to Duke administrators.

This court finds that the act of obtaining and disseminating confidential information is a crucial part of the IIED claim against Broderick. Because Plaintiff has not alleged that Duke had knowledge of this material fact, Duke was not capable of ratifying Broderick's conduct and Plaintiff cannot state an IIED claim against Duke based on this conduct. Duke's motion to dismiss Plaintiff's IIED claim will be granted.

## VIII. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

NIED is premised on negligent, rather than extreme and outrageous, conduct by the defendant.

> [T]o state a claim for negligent infliction of
> emotional distress, a plaintiff must allege that (1)
> the defendant negligently engaged in conduct, (2) it
> was reasonably foreseeable that such conduct would
> cause the plaintiff severe emotional distress . . .
> and (3) the conduct did in fact cause the plaintiff
> severe emotional distress.

---

[18] While Plaintiff does allege that a Student Affairs official told her that Plaintiff's letter to Broderick would not be kept confidential, (see Am. Compl. (Doc. 20) ¶ 32), (1) this official does not appear to be a managing administrator capable of acting on behalf of the university and (2) this statement relates only to the letter and not to Plaintiff's university records.

Ruark Obstetrics, 327 N.C. at 304, 395 S.E.2d at 97. The first element requires, as with ordinary negligence claims, that the plaintiff show "the breach of a legal duty owed by defendant that proximately causes injury to plaintiff." Guthrie, 152 N.C. App. at 25, 567 S.E.2d at 410. "Allegations of intentional conduct, . . . even when construed liberally on a motion to dismiss, cannot satisfy the negligence element of an NIED claim." Horne, 228 N.C. App. at 149, 746 S.E.2d at 19.

### A.   NIED Claims against Bishop and Broderick

Plaintiff alleges only intentional acts by Defendants Bishop and Broderick, as opposed to negligent conduct. Therefore, Plaintiff fails to allege that either Defendant acted negligently and has not stated a claim against either for NIED. The motions to dismiss filed by Defendants Bishop and Broderick will be granted as to Plaintiff's NIED clams.

### B.   NIED Claim against Duke

To show negligent conduct by Duke, Plaintiff must plausibly allege that Duke (1) breached a recognized legal duty to Plaintiff and (2) that this breach proximately caused injury to Plaintiff. Guthrie, 152 N.C. App. at 25, 567 S.E.2d at 410. Because Plaintiff alleges an omission rather any affirmative act by Duke, (see Am. Compl. (Doc. 20) ¶ 50), "negligence may arise where a special relationship exists between the parties."

Davidson v. Univ. of N.C. at Chapel Hill, 142 N.C. App. 544, 554, 543 S.E.2d 920, 926 (2001). In Davidson, the North Carolina Court of Appeals held that a special relationship existed between a college and a student-athlete who "was injured while practicing as part of a school-sponsored, intercollegiate team." Id. at 556, 543 S.E.2d at 928. However, the court cautioned "that a university should not generally be an insurer of its students' safety, and that, therefore, the student-university relationship, standing alone, does not constitute a special relationship giving rise to a duty of care." Id.; see also Mynhardt v. Elon Univ., 220 N.C. App. 368, 375–76, 725 S.E.2d 632, 637 (2012) (finding no special relationship between a college and a student in the context of an off-campus party).

Davidson stands merely for the proposition that, "when a school exerts significant control over students as a result of their participation in a school-sponsored athletic activity, the students may have higher expectations with regard to the protection they will receive." 142 N.C. App. at 555–56, 543 S.E.2d at 927. Here, Plaintiff has not alleged anything that differentiates herself from other Duke students or suggests that Duke was in any way dependent upon her. See id. ("[S]pecial relationships are most often premised upon the existence of mutual dependence.") (emphasis added). Plaintiff also does not

allege that her actions created any economic benefit for Duke. See id. at 554, 543 S.E.2d at 927 ("[S]uch relations have often involved some existing or potential economic advantage to the defendant.") (quoting Prosser and Keeton on the Law of Torts, § 56 (5th ed. 1984)). Therefore, Plaintiff was similarly situated to all other Duke students with respect to counselling and support services. It is of course regrettable that Plaintiff apparently was provided no support at all through the university. But, under the facts alleged, this court sees no alternative but to apply the default rule that there is no special relationship between a college and its students. See Davidson, 142 N.C. App. at 556, 543 S.E.2d at 928.

Further, this court finds that any voluntary promulgation of procedures to counsel or advise sexual assault victims does not, by itself, constitute a voluntary undertaking by Duke that creates a special relationship with sexual assault victims. See McCants v. Nat'l Coll. Athletic Ass'n, 201 F. Supp. 3d 732, 745–46 (M.D.N.C. 2016) ("While rules and regulations promulgated by the NCAA may be relevant to the issue of breach of the standard of care, they are irrelevant to the threshold issue of whether a legal duty exists in the first instance."); see also Hall v. Toreros, II, Inc., 176 N.C. App. 309, 317, 626 S.E.2d 861, 867 (2006) (noting that imposing a duty based on voluntary rules

would "discourage, indeed penalize, voluntary assumption or self-imposition of safety standards by commercial enterprises, thereby increasing the risk of danger to their customers and the public"). While these procedures might be evidence of breach if a duty did exist, they cannot independently establish that duty.

This court concludes that there was no special relationship between Duke and Plaintiff. As a result, Duke had no legal duty to act and could not have been negligent. Plaintiff fails to state a claim against Duke for NIED and Duke's motion to dismiss that claim will be granted.

## IX.  NEGLIGENCE

"To recover damages for actionable negligence, plaintiff must establish (1) a legal duty, (2) a breach thereof, and (3) injury proximately caused by such breach." Petty v. Cranston Print Works Co., 243 N.C. 292, 298, 90 S.E.2d 717, 721 (N.C. 1956).

### A.  Negligence Claims against Bishop and Broderick

Intentional acts cannot form the basis for a negligence claim. See, e.g., Brewer v. Harris, 279 N.C. 288, 297, 182 S.E.2d 345, 350 (1971) ("[T]he idea of negligence is eliminated only when the injury or damage is intentional."); Givens v. Sellars, 273 N.C. 44, 49, 159 S.E.2d 530, 535 (1968) ("Intentional acts are legally distinguishable from negligent

acts.") Here, Broderick and Bishop fully intended any resulting injury to Plaintiff's reputation or mental and emotional health. Therefore, Plaintiff alleges only intentional acts by Defendants Broderick and Bishop and cannot state a claim for negligence against either Defendant. The motions to dismiss filed by Defendants Bishop and Broderick will be granted as to Plaintiff's negligence claims.

## B.    Negligence Claim against Duke

Plaintiff alleges only that Duke omitted to act in response to Plaintiff's sexual assault report and information about Broderick's alleged harassment toward Plaintiff. As discussed above, Plaintiff has not plausibly alleged a special relationship that created any duty to act on Duke's part. Therefore, Plaintiff cannot establish a legal duty and fails to state a claim for negligence against Duke.[19] Duke's motion to dismiss this claim will be granted.

---

[19] This court further observes that Plaintiff may be unable to show that Duke's omissions proximately caused her any injury, as (assuming that Plaintiff's allegations are presented in at least rough chronological order) Plaintiff likely learned of Duke's inaction only after she had already begun to receive treatment for the medical conditions listed in the Complaint.

**X.  CONCLUSION**

For the foregoing reasons, this court finds that the motion to dismiss filed by Defendant Duke University should be granted in full. This court further finds that the motions to dismiss filed by Defendant Sheila Broderick and Defendant Steven Thomas Bishop should each be granted in part and denied in part, as set forth herein.

**IT IS THEREFORE ORDERED** that Defendant Duke University's motion to dismiss, (Doc. 29), is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant Sheila Broderick's motion to dismiss, (Doc. 26), is **GRANTED IN PART AND DENIED IN PART** as set forth herein, in that the motion is **GRANTED** as to Plaintiff's claims for violation of N.C. Gen. Stat. § 99D-1 et seq., violation of N.C. Gen. Stat. § 75-1 et seq., negligent infliction of emotional distress, and negligence, and **DENIED** as to Plaintiff's claim for intentional infliction of emotional distress.

**IT IS FURTHER ORDERED** that Defendant Steven Thomas Bishop's motion to dismiss, (Doc. 31), is **GRANTED IN PART AND DENIED IN PART** as set forth herein, in that the motion is **GRANTED** as to Plaintiff's claims for violation of N.C. Gen. Stat. § 99D-1 et seq., negligent infliction of emotional distress, and

negligence, and **DENIED** as to Plaintiff's claim for intentional infliction of emotional distress.

This the 25th day of March, 2019.

_____
United States District Judge